The Honorable The judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw an eye and give their attention where the court is now sitting. God save the United States and this Honorable Court. Please be seated. Good morning and welcome. Judge Wynn and Judge Harris and I are pleased to be hearing your cases today. We are proceeding first in the case of Altony Brooks v. Captain Jacumin. Jacumin, Your Honor. Jacumin. Okay. Thank you very much. Thank you, Your Honor, and may it please the court. I'm Thomas Birch from the Appellate Clinic of the University of Georgia appointed by the court to represent Mr. Brooks. Today, one of our third-year students, Mr. Daniel Lockaby, will present argument on our behalf and I'll be at council table. Thank you, Your Honors. All right. Thank you. Thank you, Your Honor, and may it please the court. I'm Daniel Lockaby and I represent Mr. Brooks. Mr. Brooks was handcuffed and surrounded by six officers when Sergeant Johnson tased him three times in a minute and 10 seconds for passively refusing to have his photo taken. The district court dismissed Sergeant Johnson from the case for failure to properly serve.  Captain Jacumin and Officer Flood finding that there was no excessive force in this case. The district court also made several procedural errors including refusing Mr. Brooks the ability to amend his complaint to properly include Sergeant Johnson, refusing him access to the use of force and taser policies of the prison facility, and refusing him access to counsel for all of these reasons. This court should reverse the district court. Now, turning to the excessive force issue, Sergeant Johnson violated Mr. Brooks' Eighth Amendment rights when she tased him while he was restrained three times and Captain Jacumin and Officer Flood are liable as bystanders for failing to intervene. This court has a lineage of cases reaching back to Orem in 2008 and several after that, including Myers in 2013, Yates v. Terry in 2016, and Henry's State of Armstrong that say... Let me ask you regarding the three tasings, which I take were three separate, do we review those separately, each to stand on its own ground and need a basis for the tasing? Or as it seems as though you argue, collectively, as though they are one tasing and therefore it applies to the whole tasing that occurs? Your Honor, each of the separate tasings will need its own individual justification, but the three tasings just supports that there was a subjective intent here for there to be punishment. Actually, any of the tasings are not justified because in order for a tasing to be proportional force, there needs to be an immediate physical safety risk. Clearly from the first tasing, the reason that seems to arise from the record that he was obeying the order, which was to be still to be photographed. And there are cases that say that as a matter of discipline, you can employ tasing. Yes, Your Honor, Mr. Brooks cannot decide what lawful orders he can follow, but this court has held that a taser is only proportional force when there is a physical safety risk present. But that's under the Fourth Amendment, right? Yes, Your Honor. That's a different standard. Yes, Your Honor, the Fourth and the Fourteenth Amendment do apply a different standard, but only insofar as there is a subjective element to that standard. Right, but there is under the Eighth Amendment, and so under the Eighth Amendment, we've said, the Supreme Court has said, that if an officer uses force in a good faith effort to maintain or restore discipline, that's okay. Yes, Your Honor. We have evidence here that this was not a good faith effort to maintain or restore discipline. Actually, looking specifically to the facts of this case, Mr. Brooks has alleged that Sergeant Johnson said, he thinks he can come into our county and do what he wants. I'm not going to tolerate it. That evidence is an intent for this to be a punishment. Actually, all the officers talked about how Mr. Brooks was difficult upon arriving to the prison. What do you think, or what is your position? What should the officers have done instead? They need to take his picture, and he's moving around. They can't take the picture. So what were they supposed to do instead? Your Honor, there are several things that the officers could have done before moving directly to the taser. They did none of those things. They could have filed a disciplinary report with the Lee Correctional Facility, where Mr. Brooks is actually housed. They could have at least threatened to file that disciplinary report. If they actually believed that Mr. Brooks was a physical threat, they could have applied ankle restraints. Well, they were trying to reason with him during the course of the video. I mean, I'm sure we all watched the video, and it was very clear that the older, if that's a proper way to describe him, of the deputies was engaging in a fairly extended course of So, I mean, they did make an attempt. It wasn't just as if the sergeant pulled out a weapon and used the weapon. Indeed, Your Honor, Captain Jackerman did attempt to reason with Mr. Brooks, but there were still other methods of compliance that they should have tried to pursue before turning to the taser. Actually, in this court's case in Orem v. Ripan, the court noted that the officer did try to get the pretrial detainee to listen to reason and apply her safety restraints in the vehicle, but when those attempts failed, he was still not allowed to tase the pretrial detainee twice in the back of the vehicle. That's a 14th Amendment case. Yes, Your Honor. This is the 8th Amendment. Yes, Your Honor, this is the 8th Amendment, but the subjective, the only difference between the 8th and the 14th Amendment is that there is a subjective requirement. The objective requirement is met here. You cannot tase someone unless there is an immediate physical safety risk. The District Court itself actually found on page 984 that Mr. Brooks posed no immediate physical safety risk at any point during this proceeding. Right, I don't understand that to really be an issue in the case. The District Court said there's no safety risk, but this is okay because there's all this case law saying that you can use a taser to induce compliance with prison regulations, and I think you started to say why there would be evidence from which a jury could infer that's not what happened here, and you got the stuff in the report about how he had been listed as being disrespectful and uncooperative. Anything else? Well, Your Honor, the statement by Sergeant Johnson, and indeed if you just look at the video, the second tasing came only 16 seconds after the first tasing while Mr. Brooks is on the ground and still shaking and trying to recover himself. That evidence is that there is no attempt to restore discipline. Mr. Brooks was incapacitated entirely. Actually, this Court in Myers stated that force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated. That is a Fourth Amendment case, but the principle still should stand in the Eighth Amendment context. Are we clear that the focus here is on the subjective component of the Eighth Amendment, the question of whether the force was applied with good faith as opposed to the objective component? Your Honor, is our position that the objective component is met because of the precedence surrounding tasers, finding that a taser should only be applied when there is a physical safety risk? I thought the objective component was whether, you know, had to do with the injury. Yes, Your Honor. And that was a very clear case law saying that unless it's de minimis, an injury is an injury and the objective component is satisfied. Yes, Your Honor. That is correct. Mr. Brooks has alleged a severe injury, including... He wouldn't even need one if it's not de minimis. Sorry. He wouldn't even need a severe injury. I understand he's alleged one, but I think the case law on this is pretty clear. Anything above a de minimis injury would satisfy the objective component. So, yes, we are looking specifically to the subjective component here. And continuing, Your Honor, looking through the Whitley factors, which is what this Court uses to analyze Eighth Amendment excessive force cases, we also need to look at the necessity, the need for this application of force. The policy that the district court considered and that the defense raises to their need for this photo has some discrepancies to it. For instance, the policy requires newly entered inmates to have their photo taken. So describe this second tasing. He is down and describing the injury that he's allegedly incurred, the meniscus being torn. I take it that was from the first tasing. Yes, Your Honor. He fell onto his knee after the first tasing. As a result of the first tasing, then he's down on the floor. Yes. How long is he there? He is there for 15 seconds before Sergeant Johnson tases him again. Actually, Your Honor, Mr. Brooks alleges that Sergeant Johnson then said, I'm going to tase you again. And before he was given the opportunity even to respond, she tased him again, showing that there was no good faith effort to actually compel his compliance. There seems to be some discrepancy between the magistrate's description of what was in the district court. This court seemed to acknowledge that he was down and there was no real thrashing going on. Was he? In fact, does the video show this? The video does not show any thrashing, Your Honor. The video shows Mr. Brooks lying on the floor, almost in the fetal position, still trying to recover himself when the second tasing is issued. How long was he on the floor? For 16 seconds was the difference between the first tasing and the second tasing. He was said that the pain in his knee and throughout his entire body was very extreme. So he was trying to, and indeed, this court has held that a tasing causes extreme pain. So he was trying to recover himself before that second tasing. If we agree with you that there was a constitutional violation here, what is your best argument for saying the right was clearly established? Well, Your Honor, all of the cases through the 4th and 14th Amendment... Well, in terms of tasing somebody in a penal institution, it's a matter of discipline. Yes. You could go over that for us. Well, we've cited several, a couple of 8th Amendment cases that are instructional. This is a matter of first impression for this court. There has not been an 8th Amendment tasing case that has come in front of this court in this context. But as the Supreme Court held in Hophy Peltzer, we don't need an exact factual similarity in order to find that there was no qualified immunity in this case. In Iko v. Shreve, which was this court's case in 2008, an inmate was instructed to put his hands out of his cell behind him and said he put them out in front of him. They used pepper spray in that case, and they pepper sprayed him multiple times. The court noted in that case that the inmate was docile and not confrontational during the time. And the last pepper spray was, again, while the inmate was on the ground in his cell. Those facts are extremely similar to the one here. Both pepper spray and tasers are used to incapacitate an inmate while you put them on the ground. Additionally, Mr. Brooks has been trying to litigate this case and establish the subjective element while not having access to the use of force and taser policies of the prison. In Iko v. Shreve, they cited the use of force policies and the pepper spray policies three different times while going through the Whitley factors to say these officers acted in violation of those policies. And so they knew no reasonable officer could assume that they were acting in accordance with them. There's a big difference, though, between pepper spray and tasing. Arguably in your favor, a taser is an electronic weapon. A pepper spray just simply debilitates somebody temporarily. But don't you have to rely on, it seems to me, if you're a pepper spray case, then aren't you necessarily saying to us, well, if pepper spray is a problem, then the taser has to be a problem? And is that the kind of legal construct that clearly established fits within? Your Honor, that is one argument that we make. But we would rely more heavily on Henry v. Armstrong, which admittedly is a Fourth Amendment case. But in Henry v. Armstrong, it says, our precedent makes clear that tasers are a proportional force only when deployed in response to immediate danger. And a footnote in that case, they say, Myers found that the officer in question violated a right that had been established since Bailey v. Kennedy in 2003. This Court has been very clear about when tasers are an acceptable use of force. It seems, and I struggle with this in other Eighth Amendment contexts too, and maybe you can help me, where the violation itself has this subjective component. So for there to be a violation, an officer has to use force in bad faith, basically maliciously, sadistically in order to inflict pain. How do you graft on top of that a qualified immunity? How can that be objectively reasonable to maliciously and wantonly use force on purpose? Well, Your Honor, the Court is also phrase wantonness in the infliction of pain. So there can be sort of an objective telling if force is applied in a wanton manner. And you can look to clearly established precedent to see when other force being applied has been found to be wanton or when the subjective requirement has been met. But I mean, it's clearly established, right, that officers can't use force sadistically in a prison. They can't use it in bad faith. That much is clearly established. If an officer does that, it just seems odd to me that an officer who has acted in subjective bad faith can then say, but this was an objectively reasonable thing for me to do. Yes, Your Honor, that is an interesting doctrinal sort of headbutt that's happening there. Yes, attention maybe is the word I'm better looking for. But at the same time, regardless of the standard we applied, it is met here. There's at least genuine dispute of material fact about the state of mind of Sergeant Johnson at the time that this tasing was happening. And Mr. Brooks should be allowed to at least carry his claim forward in that respect. And the fact that he was not able to have the use of force and taser policies really crippled his ability to show that finding of the subjective inquiry. Well, I mean, who knows, right? It might have been to the officer's advantage. If the policy says someone won't pose for a picture, you should use a taser. That would probably help them in terms of state of mind. Absolutely, Your Honor. It could have come out in favor of the officers in this case. But this court could find, based on the information we've been talking about so far, that there was excessive force in this case. It should not be able to find, though, that there was no excessive force without being able to turn to the very policies that the officers themselves are instructed on. If they were acting in violation of those policies, it would not make sense for them to then say that they had a reasonable good faith reliance, that they were acting within the bounds of the law and acting within the bounds of their own policies. The court never even saw those policies. Mr. Brooks never had access to the policies. Now, they claim that there was a necessity to keep the prison safe and to keep everyone safe within the prison. Of course, prison safety is a valid consideration. But at least the court can do in-camera review and redact any information that isn't pertinent to Mr. Brooks's claim. This court has seen, as I said before, IKO. Ahorum was another case. It's relied several times on these sort of use of force policies when the use of force is relevant to the case. So they should have had access to that. Thank you, Your Honor. Thank you very much. Mr. D'Antonio. Thank you, Your Honor. May it please the court. Mr. Brooks was tased in a good faith effort to maintain and restore discipline, not maliciously, not sadistically, for the purpose of causing harm. The tape sure suggests otherwise. I disagree. Well, wait a minute. Listen to what I'm saying. Even if the first tasing arguably was to get the inmate to cooperate with a lawful directive, how does tasing someone when he is on the floor, knocked off his chair, how is that a good faith effort to maintain discipline? J.A. 29, Mr. Brooks admits that after he was tased the first time, he attempts to pull the prongs out of his legs. So? If he pulls the prongs out, then they've got no other recourse other than a taser, other than to get physically on top of this guy. He was handcuffed. I don't understand what the security issue was. This man was handcuffed. There were six officers around, and he had already been tased once. He'd been knocked to the ground, and there was a need to fire this electronic weapon a second and third time. He was resistant the entire time, passively, but still resistant. How could he have cooperated while he was lying on the ground? I mean, how could he even have gotten his head into the photo frame? I don't understand what you mean he was resisting. He's lying on the ground. Before they could get him up off the ground, he's trying to pull the prongs out of his leg. So they tased him again to prevent him from doing that so that they could... Is that anywhere in... Does Sergeant Johnson say that's why she tased him the second time? I don't believe Sergeant Johnson states that in her report. I believe it's the complaint. It's a JA-29 where Mr. Brooks admits that he tried to pull the prongs out of his leg. But does anyone say that that's why he was tased the second time? I don't believe that's in the record. I may understand what you're saying. You're saying someone who has been tased, after they've been tased, if they attempt to remove that that is tasing them, that's grounds to continue to tase them. I think that's an additional justification for the use of force. Additional to what? The initial justification was the fact that he's not obeying a simple order. Not that. That's the first taser. You're talking about the second taser. Each one is separate. Correct. Additional to what? Additional is the fact that they can no longer control him once he takes this taser out. He's on the ground. He's not moving. We saw his video. You saw this video. It's pretty stark. That second one, he's laying on the ground. He's not moving. I don't know about this pulling out. I'll have to go back and look to see that. I haven't seen that at all. But even if he is, he's trying to remove something that is causing him great pain. Nothing else. And you say if you do that, you can tase him again? They've already been unable to get him under control in the first place. I'm sorry. He's under control in that he's in handcuffs and surrounded by six officers. They've been unable to get him to hold his head still within the frame of the camera. So I think we should be careful about the language here. The district court made a finding. There's no risk of physical safety or anything like that going on. There's no physical threat. And there doesn't need to be a physical threat under the 8th Amendment. That's a 4th and a 14th Amendment thing. And so here, they've got authorization through the 8th Amendment to use force to compel his obedience to take this photo. They're allowed to go straight to a taser? Absolutely not. They spent seven minutes of verbal directives. I mean, the video starts, we see seven minutes. Clearly, this incident was ongoing before that. There's verbal directives. These officers are patiently and deliberately escalating the force very slowly. So we're back on the first taser, which you say is a basis for it. The defendant asked for policies. Was there a policy regarding the tasing? And as I recall, the district court didn't let him get those policies. It's pretty commonplace for pro se inmates to not have access to security policies, such as use of force taser policies, because it can be used against the officers that are supposed to be taken care of. I mean, it happens pretty often. Wouldn't that assist potentially in determining whether a policy is clearly established? I don't know if they're prison... If, in fact, there was a policy that was violated here, and then your contention is that, well, it might have been a violation of the 8th Amendment, but it wasn't clearly established, wouldn't knowing those policies, even for that limited purpose, or even the court reviewed it in camera and says, well, there's nothing here to show that. I mean, shouldn't he have access to that? I don't think the judge possibly, but the policy is somewhat relevant. But at the end of the day, it's the Whitley factors that govern. How do we know? We haven't seen him. He didn't get a chance to see the policy. But if you've got case laws pretty clear, if there's a policy set up to go in a particular direction, that can be the clearly established qualified immunity defense. Even though you don't have a case law on it, nor do you have a Supreme Court case on it, if you've got a policy to tell you how to do it, you don't do it. That's relevant. I can see it being relevant. It's just not determinative. But you see, my concern is it seems quite possible to me, at least hypothetically, that the policy could be very helpful to the officers if the policy actually said, in this penal institution, we use tasers as the very first disciplinary sanction we apply. And you should use it if someone won't hold their head still for a photo. That would be a good fact under the subjective test. So I worry that if this were favorable to the officers, it would have been produced. And if it's not favorable, it doesn't get produced. That's my concern. I think if the policy said that they could go straight to a taser, I mean, this court could still say that's unreasonable under the Eighth Amendment. Well, maybe we could, but it's a subjective standard. What were these officers thinking when they used the force? And so it would certainly be helpful to the officers. So how are we supposed to know which way this policy cuts since it's never been produced? It's not on the record what the policy states. I know. That's my concern. I don't think the policy is as relevant as the fact the past case law and the actions in the video that we've seen. I think we can make the determination without the policy, whether it's good or bad for either side. But we've got cases that say if you violate the policy, that is some evidence that the conduct was malicious in violation of the policy. If you've got it set up that you do it a particular way and you do it totally different, you've got cases that say that's evidence of the maliciousness of the act. I'm not sure how to answer that, Your Honor. Well, maybe the answer would be we should send it back and allow for the policy. It doesn't mean it's the end of the case, but just be fair about it. Show what the policy is so it can be determined. Or have the court look at it. If the policy is produced, I don't think it's going to change the fact, performed and finding there's no constitutional violation. We don't even get to the clearly established law, because he found that there is no constitutional violation. We're dealing with maliciousness of it, which you do get into it in the subjective prong of the Eighth Amendment, which is a question. There is a malicious prong, a component of that. Correct. And if the policy may not be helpful in other respects, but if we've got case law that say if you don't follow your policy, I don't know what that policy is. You don't know what it is. Well, you may know, but I don't know what it is. And the defendant doesn't know. If you don't know the policy, you can't know whether they violate it. And therefore, you can't be able to assert that the violation of policy was malicious. I understand the policy is relevant. I just don't think that a policy is going to trump the case law in the first place. Well, OK. Let me ask you about the case law then. So assume hypothetically that just having watched the video, I find it, I think that maybe it was a jury question on the second and third tees, whether those were being used to compel compliance or to punish, just because I think a reasonable jury may just assume this. A reasonable jury might be able to infer that if the intent were to compel compliance, you would give this guy a minute to collect himself and actually change his mind, sort of readjust. But if that's a jury question, and again, I'm just asking you to assume this hypothetically, doesn't it also at least call into question what was the purpose of the first use of the taser? If a jury could find that the second and third were to punish, isn't that enough from which they might infer maybe the first one is bad too? I disagree. Because they all come in very quick succession. So you would have to be then hypothesizing that the officers had one intent the first time they used it, and then 20 seconds later had a different intent. I think the second tasing was performed because of the taser. I know, but I guess I'm asking you to just indulge me in my hypothetical. So if hypothetically somebody thought that there was a reasonable jury question as to the intent behind the second and third tasings, what bearing would that have on the first? I don't think it would have any bearing due to everything that we saw before the first tasing. There was an initial justification for that first tasing, which was to compel this inmate to sit still and look at a camera for a couple of seconds. After seven minutes of that not working, as they're talking to him, there's one officer who's physically holding on to him, just trying to get him to look at the camera. They warn him he's going to be tased. He admits he got that warning. He admits he continued to resist. He knew he was going to get tased, and he got tased. The initial justification for that force was not over until the photo was taken. You compare that to Myers, which is a Fourth Amendment case. So how many times do you think they could have tased him in order to try to make him sit still for this photo? If the third, if he was still moving his head on the third one, could they have done it four times, five times, ten times? If they stood him back up and gave him the meaningful- He's still moving his head. It's been 50 seconds and he's still moving his head. I, I would think that if they put him back in front of the camera and gave him another meaningful opportunity to comply with their orders, and he continued to resist, then yes, it would be allowed to tase him again. So they could tase him until he died, essentially, right? Under your rationale. I don't think so. I don't think that- At what point would they have to stop? Say he's just keep, he keeps moving his head. It's either an effect of the tasing, or he's doing it on purpose. But for whatever reason, his head is still moving. They can't quite get it in frame. How many times can they tase him? I don't know the answer to that question, but- Seems important. I think so. I don't think that, obviously, deadly force couldn't be used in a situation like this. I mean, they're just trying to get a photo, I do understand that. But at the same time, officers are allowed to use force to compel obedience in these situations. To what extent do we consider the fact that the obedience that was being compelled was to take a photo when he was on his way out of this institution? He had already appeared in court. They had a photo of him that was three years old, and they wanted an up-to-date photo. But to what extent do we consider that, as opposed to a situation where he was trying to incite other inmates to do something? Seems to me this is a pretty de minimis situation, where he was on his way out. They already had a photo. He was being obnoxious. Certainly, they could have filed a report on him to give him some discipline where he's going, deny him, I don't know, sports or whatever. But where is the reason for even having to do tase your number one? Is, I guess, what I'm struggling with. There's been a certain judicial deference to the adoption and execution of prison policies. It's been held in other cases that it's pretty important for prisons to have a photo documentation of what inmates are in their jail at a particular time. Well, they had one. They had one from three years ago. There's nothing unreasonable about wanting a photo of what this guy looked like at the time that he was in their jail on that day. Is there any evidence in the record regarding whether his appearance had changed, and they knew that, and they felt they had to have this photo, even though he was on his way out the door? There's no evidence in the record. And this was solely taken on the way out the door because he was too uncooperative on the day he arrived the day before. So they let him go to his PCR hearing the next day. And when he comes back, they still have a box to check that they need to take this photo before he leaves the jail to get some kind of record of what he looked like at the time. So they go back, and they take him into the room, and this whole event begins. It's definitely a problem. I mean, I understand what you're saying. They've got to do something. But do they have to fire this electronic weapon at the person who won't let his picture be taken? I mean, it just seems to me that there's some cases that are so obvious that you shouldn't do this. Any officer would have to know. I disagree. This is an obvious case. After they've let him avoid this policy for seven minutes, you can't let inmates decide when they're going to abide by a policy, whether they're going to. The entire purpose of prison security fails if inmates can just decide. But is this literally the only disciplinary tool these people have access to? I feel that we see so many cases with sort of escalated disciplinary sanctions. Like you file a report, and you can't do sports, or you can't go outside, or worst case scenario, you're in solitary confinement. I mean, I always thought that there were escalated responses available to officers, but not in this circumstance. In this situation, that wouldn't get the photo taken. If they were, say, going to transport an inmate, if the inmate refuses to be transported, you can't just leave him there and say, OK, we're going to file a report. But again, it's hard for me to see the exigency here. He's leaving anyway. So he's not going to be in their institution anymore. He's going back to his home institution. They can sanction him there, take a picture, and send it to you guys if it's so important to have this memory book of who used to be in your prison. I think that that kind of idea of what they could have done differently is an exercise in 2020 hindsight that qualified immunity cautions us from doing in this case. These officers were on the ground in a situation that was evolving somewhat quickly, even though they're doing their best to gradually escalate the force. Right. But our cases, I mean, the classic fourth circuit phrase is protecting officers from bad guesses in gray areas. And I think the whole point of the questions here from the bench have been, what's the gray area here? What was so undecided and so murky that these officers, even though they made a bad guess that they could use this weapon on this man, what were the facts that suggested that this situation called for it? I think the gray area was the fact that they used a taser. It wasn't until the Fourth Amendment case in Armstrong, and then before that, the 14th Amendment in Orem v. Refn, where tasers are being called into question more and more. Certainly. Myers came out before this. Correct. It was obviously Fourth Amendment. Right. But Myers said once somebody stops resisting, the game's over. You don't keep firing your weapons. Myers, my restraining admires, it said that the initial justification for the use of force, it ceased after that third tasing. Their purpose was to seize him to arrest him. They get him on the ground. He's restrained. There's no need to tase him seven more times. Also, he died as a result. In this case, the initial justification for the force was not over until the policy was complied with. Well, let's go back to that. You said he had 67 minutes in the beginning, which would indicate he had a reasonable opportunity to respond. That seemed to be it, and that he did. Correct. From my perspective. And then you say after they stood him up, they had to give him another reasonable opportunity to respond. Correct. What about between tasers? If you tase him one time, do you have to give him a reasonable opportunity to respond before you tase him the second time? And then between the second and third, do you have to give a reasonable opportunity to respond? Between the second and the third, I believe that there was. And the first and the second? The first and the second was a different justification because he's now removing... But again, a justification that appears nowhere in the record. I appreciate what's going on here, but I don't see how we can possibly rely on that. Not one of the people in this case says that's why they tased him the second time. Your response to that question, are you admitting that they did not give him a reasonable opportunity to respond between the first and second, so therefore you need a different justification? I'm not admitting that, no. Tell me, tell me, did they give him a reasonable opportunity to respond between the first and the second taser? Yes, I believe that they did. And where did you see that? Because tell me on the video, what did you see that indicates there was a reasonable opportunity to respond and also take in mind the district court made findings that were different from the magistrate on that one. Where do you get this evidence from? In the video and in his admissions that he attempted to pull the program out of his leg. I think that creates a different situation. Well, that's your justification. I'm saying the reasonable opportunity to respond. In other words, you're not trying to tase him. What you're trying to do is get him to take this picture. Correct. And so if you tase a person, shouldn't you say, okay, I want you now to take the picture or do something to say, is that enough? Do you now get the picture? Or do you just let him lie on the floor for 16 seconds and shoot him up again? I mean, even though at that point, he might be fully compliant because on the third one, he became fully compliant. Well, I don't know if he was fully compliant after the third, but in their incident reports, they say that he continues to resist after each and every tasing or after the first and the second at least. By tying all this up, I just want to hit on the point compared to Orem and Armstrong, which are 4th and 14th Amendment cases. Wait, wait, I'm sorry. Tell me, is there a material difference between a pepper spray and a taser? I think that there is. I mean, they're unique uses of force. What would it be? Both of them are force and both of them are analyzing the 8th Amendment and ICO. What would be the difference? In ICO, the facts were way more severe. I mean, I believe he was motionless, lying face... But the point was clear that after the first one, the second was not good. After he's lying motionless on the ground in his cell. Yes. I don't think we had that situation here. This was a faster... But if we do, and if that video shows on the second one, he's lying in a fetal position, motionless on the ground. If the video shows that, then do you acknowledge that it would be similar to ICO? If it showed that. I don't think so. I think that there's a difference between a taser and chemical munitions in the first place. You think that does it... And you think that difference cuts in your favor, that it's less severe to use a taser? At least in the qualified immunity analysis, I don't think we pointed to an 8th Amendment case. People have died from tasers. You just gave us a case in which the individual died from the taser. It's possible, yes. What's the difference with the pepper spray? There's different situations where pepper spray is appropriate and where tasers are appropriate. We're only talking about the use of force and whether or not it is appropriate under circumstances is a subjective component of the 8th Amendment. And when we look there, the two seem very similar. I'm not getting into the difference between pepper spray, whether or not that's worse than the tasers. The question is the use of force. And if you're applying the use of force and the person is on the ground in a fetal position and not moving, does it matter whether it is tasing or pepper spray? I believe that it is a different situation whether they're on the ground or not. The use of force is going to change depending on circumstances in any case. I understand your belief, but that's not responsive to my question. My question is an individual who is on the ground. I'm not trying to be argumentative. I'm just explaining. If the video shows the individual's on the floor, he's in a fetal position, after having been, let's say, admittedly tased and not in violation of the Eighth Amendment the first time, then he's down on the floor for 16 seconds, he does not move, he's in a fetal position, does it make a difference if you then employ pepper spray or a taser for the Eighth Amendment analysis subjectively? I don't think that it does. It's still a use of force if he's totally motionless. Can I ask about Orem? I know you have said that that is a 14th Amendment case, but at the time, isn't it true that the 14th Amendment standard was literally identical to the Eighth Amendment standard? It was whether the officer... I mean, I know that the Supreme Court changed that later in Kingsley, but at the time we decided Orem, we were applying the Whitley factors, the exact same standard we apply under the Eighth Amendment. So wouldn't that case be pretty much... They're very similar standards, for sure. There's different justifications for force. The situation, Orem and Armstrong posed similar situations where the court found that there was no efforts to de-escalate the situation before the use of force. Orem is not the one where the officer talked to the person first? You can see in the transcript of what they said, it was probably about 15 seconds. He arrives at the back door of the car, he argues with her for about 15 seconds and tasers her immediately. Okay, but the only... Actually, I didn't mean to hold you up and I know your time is up, but you do agree that Orem applies the same legal standard that we're looking at here? A similar legal standard, but it's... It applies Whitley. It applies the exact same case we're applying here. Yes. Okay. Thank you, Your Honors. All right, thank you. Mr. Lockerbie? Thank you, Your Honors. To address Judge Winn's point about a reasonable opportunity to respond, in his initial complaint, Mr. Brooks says that Sergeant Johnson tells him why he's on the ground, that she is going to tase him and then tases him immediately without giving him any opportunity to respond. At a particular point, I was trying to get the facts of it. And as I understood from opposing counsel, there was reasonable justification or at least a reasonable opportunity to respond. Initially, when you have six or seven minutes, you probably can all agree, yeah, you should be... They give you a chance to respond. And then he seems to allude that, well, when he stands up, you've got to give it. My question was between the first and the second, must you give a reasonable opportunity to respond in between the second and the third? And the answer seemed to have been between the second and third, there was a reasonable opportunity to respond, but I didn't quite get clear as to whether there was a reasonable opportunity to respond between the first and the second. Because at least the contention was, well, maybe you don't need it because it was a different justification. He's trying to pull out the prongs. Well, Your Honor, to address that point, actually, if you look to page 29 of the record, which is what the defense cited, that's Mr. Brooks's complaint. He actually says that he tried to pull out the prongs between the second and third tasing. He did not try to pull out the prongs while he was on the ground. There is no justification for tasing him there. What does the video show? I've not done a while since the video. The video. What does the video show between the first and the second? Does it show him pulling those prongs? No, Your Honor. Then we see it. I could not see any pulling. Is it clear? It is not clear at all as to whether at any point. But he's not really on camera there at that time, is he? Well, he's on the ground, Your Honor. You can't see him on the ground. But the whole time you see his head. Yeah, well, you can see him lying on the ground. There are also officers standing around him. Standing around him. So you cannot see his full body. So you're saying you could see his full body? No, you can't see his full body during this time. So it's unclear whether or not he ever tried to pull the taser out of his leg. But if he did, it was between the second and third tasings. It was not between the first and the second. Was there any other testimony other than Mr. Brooks as to when the pulling of the prongs, of the taser prongs occurred? No, Your Honor. It never appears again in any other. So that's in the record. We don't need to dispute that. We can look to see where that, if that's the basis for what you say, the only evidence is second and third. There's nothing for the second. Yes, Your Honor. Yes, Your Honor. It's on page 29 of the record. You can look directly to that. And talking about the escalation of the use of force, the amount of time that they spent talking with him before the first application of force. It would be much easier to know what the proper escalation of force would be if we had access to those use of force policies. And we would be OK with this court remanding for review of those policies. But we do also believe this court could find on the excessive force and qualified immunity issues separately. How should a review be if the contention is that, you know, these policies are there for a purpose. And we must have these policies. But we can't just put them all out because it might interfere with the ability of officers to administer discipline. So should we direct the district court to conduct a camera review to determine if it is of some value? Your Honor, this court could decide to do that. It could also decide that Mr. Brooks was entitled to counsel. So his counsel could have reviewed this. Additionally, Your Honor, the district court should have allowed Mr. Brooks leave to amend his complaint to include Sergeant Johnson, in this case, the actual person who tased him. I mean, I think you already pointed this out. We have a lot of cases that talk about these prison policies. They're right there in the F-3rds. I don't understand. Did all of those raise risks to prison security also? Your Honor, if they did, then the court didn't find those to be reasonable justifications to refuse access to the policies. Well, not only that, but we wrote down what they said, and then we put it out in public. I mean, no one told us that they were under seal or anything. Harris v. Copeland, which is a 2013 case. The District of South Carolina, the prison policies there, the exact same policies we presume that are at issue here, were put into the record and were used to find that case. So there is ample evidence in the record and in case law that these policies should have come out. Sergeant Johnson should have been included in this case. Mr. Brooks made every effort to include her in this case. He just misspelled her name, called her Lieutenant Johnson instead of Sergeant Johnston in his initial complaint. And then when he discovered his mistake, he mailed both the district court and the marshal service trying to get her included in this case. And still the district court refused him the opportunity to amend his complaint or extend service. Actually, they did grant an extension of service that constricted the amount of time that he had to serve earlier than the statutory limit. For those reasons, this court should reverse and find in favor of Mr. Brooks. Thank you. All right, sir. Thank you very much. We'll come down and greet counsel.
judges: Barbara Milano Keenan, James A. Wynn Jr., Pamela A. Harris